ARKANSAS RIGHT TO LIFE STATE POLITICAL ACTION COMMITTEE and Marianne Linane, Plaintiffs,

v.

Brad BUTLER, in his Official Capacity as State Attorney for Benton County, Troy Burris, in his Official Capacity as Chairman and Member of the Arkansas Ethics Commission, Rita Looney, in her Official Capacity as Member of the Arkansas Ethics Commission, Norton Wison, in his Official Capacity as Member of the Arkansas Ethics Commission, Candi Sue Russell, in her Official Capacity as Member of the Arkansas Ethics Commission, and Marvin Delph, in his Official Capacity as a Member of the Arkansas Ethics Commission, Defendants.

Paul Kelly, Genevieve Stewart, Association of Community Organizations for Reform now Political Action Committee, and Local 100 of the Service Employees International Union, AFL–CIO Political Action Committee, Defendants–Intervenors.

Civil No. 97–5064.

United States District Court, W.D. Arkansas, Fayetteville Division.

Nov. 18, 1997.

David G. Nixon, Michael David Holland, Jr., David G. Nixon & Associates, Fayetteville, AR, James Bopp, Jr., Bopp, Coleson & Bostrom, Terre Haute, IN, for Plaintiff.

Brian G. Brooks, Asst. Atty. Gen., Little Rock, AR, for Defendants.

Scott Trotter, Trotter Law Firm, Little Rock, AR, Nancy Northup, Kenneth Weine, Burt Neuborne, E. Joshua Rosenkranz, Glen Moramarco, New York, NY, for Intervenors.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, District Judge.

Currently before this court is plaintiffs' motion for summary judgment and defendants' and intervenors' responses thereto. For the reasons set forth below, plaintiffs' motion is granted in part and denied in part. Also before the court is plaintiffs' motion to amend their complaint. Plaintiffs' motion to amend is granted.

### I. BACKGROUND

Plaintiffs bring this lawsuit challenging the constitutionality of Initiated Act I of 1996, popularly known as the "Campaign Contribution Limits and Disclosure Act" (hereinafter the "Act"), which amends Arkansas' campaign finance laws. Plaintiffs claim that certain sections of Arkansas' campaign finance laws impinge on their First Amendment rights to free speech and association, as well as, their Fourteenth Amendment right to equal protection. Specifically, plaintiffs claim that Arkansas' campaign finance laws violate the First Amendment by: (1) unreasonably limiting the amounts that political action committees (hereinafter "PACs") and individuals may contribute to other PACs and political candidates; (2) requiring persons who make independent expenditures to place disclaimers on political advertisements; (3) conditioning the receipt of a credit on the content of speech; (4) banning campaign contributions during sessions of the General Assembly; and (5) granting authority to localities to set even lower contribution limits than state law imposes. Plaintiffs allege that the Act violates the Equal Protection Clause of the Fourteenth Amendment by treating similarly situated persons differently with respect to the amounts that they may contribute and the benefits they might receive. Fi-

nally, plaintiffs contend that the contribution limits contained in Title 7 of the Arkansas Code are unconstitutional on their face. Plaintiffs seek declaratory and injunctive relief from this court.

There are two plaintiffs in this action. Plaintiff Arkansas Right to Life State Political Action Committee (hereinafter "ARL") is a registered, internal, state political action committee, established by Arkansas Right to Life, Inc., under the laws of the State of Arkansas, that intends to receive and make contributions and independent expenditures. Plaintiff Marianne Linane is a voter and citizen of the State of Arkansas, a resident of Benton County, Arkansas, and a board member of Arkansas Right to Life, Inc. Plaintiff Linane has contributed to political campaigns and political action committees, specifically ARL, in the past and intends to do so again in the future.

The defendants in this action include Brad Butler, the prosecuting attorney for Benton County, Arkansas, the county in which plaintiff Marianne Linane resides, and the members of the Arkansas Ethics Commission (hereinafter "the Commission") in their official capacities. The Commission serves as an overseer and partial enforcer of Arkansas' campaign finance laws.

Defendants filed a motion to dismiss, a motion to transfer and a motion to stay on May 23, 1997. In a Memorandum Opinion dated July 11, 1997, we denied defendants' motions.

The defendants-intervenors filed a motion to intervene in this case on August 13, 1997.[1] In a Memorandum Opinion dated September 30, 1997, this court granted their motion. The defendants-intervenors are: Paul Kelly; Genevieve Stewart; Association of Community Organizations for Reform Now Political Action Committee (hereinafter "ACORN PAC"); and Local 100 of the Service Employees International Union, AFL–CIO, Political Action Committee (hereinafter "Local 100 SEIU PAC").

Paul Kelly is a Senior Program Coordinator with the Arkansas Advocates for Children and Families. In 1996, he was elected to serve a four year term on the Little Rock City Board of Directors. Genevieve Stewart is a pre-school teacher in Little Rock, Arkansas. She ran for a position on the Little Rock City Board of Directors in 1996 and lost. ACORN PAC and Local 100 SEIU PAC are Arkansas political action committees.

This action was filed on April 30, 1997; however, another action was previously filed challenging the constitutionality of certain provisions of the Act. On February 3, 1997, the case of *Russell v. Burris,* 978 F.Supp. 1211 (E.D.Ark.1997), was filed in the United States District Court for the Eastern District of Arkansas, Western Division. The plaintiffs in *Russell* raised several challenges to Arkansas' campaign financing laws. The challenges included: (1) a claim that the $100 and $300 dollar limits on the amount individuals can contribute to candidates for certain state and local offices violated their First Amendment rights to freedom of speech, freedom of association, and freedom of political expression; (2) a claim that the limit on the amount that an approved political action committee may donate to candidates for state and local offices violated the Equal Protection Clause of the Fourteenth Amendment; (3) a claim that the $200 limit on contributions that individuals can make to approved political action committees violated their First Amendment rights to freedom of association and freedom of political expression; (4) a claim that the $500 ceiling on annual contributions to independent expenditure committees violated individual donors' First Amendment rights to freedom of association and freedom of political expression; and (5) a claim that the authority granted to local jurisdictions to set even lower contribution limits than state law imposes violated their First Amendment rights.

The Honorable Wm. R. Wilson, Jr. held, after several days of trial testimony, in a Memorandum Opinion dated October 3, 1997, that: (1) the $100 dollar per election contribution limit on the amount individuals can contribute to certain candidates is constitutional, except as it applies to the offices of Supreme Court Justice and Court of Appeals

---

1. Citizens for Clean Government ("CCG") also moved to intervene as a defendant in this action.

However, we determined that CCG lacked Article III standing, and thus, denied its motion.

Judge; (2) the $300 dollar limit on the amount individuals can contribute to enumerated statewide offices is unconstitutional; (3) the $100 and $300 limits on the amount that an "approved political action committee" may donate to candidates for state and local offices, as opposed to the $2,500 limit on the amount a "small donor political action committee" may donate to candidates, is constitutional and does not violate the Equal Protection Clause of the Fourteenth Amendment; (4) the $200 limit on contributions that persons can make to approved political action committees is constitutional; (5) plaintiffs lacked standing to challenge the constitutionality of the $500 ceiling on annual contributions to independent expenditure committees; and (6) plaintiffs' claim that Arkansas Code § 7–6–224 (Michie Repl.1993) [2] is unconstitutional is not ripe.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. *Holloway v. Lockhart,* 813 F.2d 874 (8th Cir.1987); Fed.R.Civ.P. 56. The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied.

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union—Management Pension Fund,* 800 F.2d 742, 746 (8th Cir.1986).

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. U.S.,* 600 F.2d 725, 727 (8th Cir.1979). Further, in cases premised on alleged violations of a person's constitutional rights, summary judgment may be inappropriate. "As is true with cases involving important public issues, courts may refuse to grant summary judgment in these actions because it is felt that a fuller record is necessary in order to be able to decide properly the issues involved." 10A Charles Alan Wright, et al., *Federal Practice and Procedure,* § 2732.2 at 340–41 (2d ed.1983) (footnotes omitted). In *Counts v. M.K.-Ferguson Co.,* 862 F.2d 1338 (8th Cir.1988), the court, reviewing the burdens of the respective parties, stated:

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., "[to] point[ ] out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.,* at 1339, *quoting, City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc.,* 838 F.2d 268, 273–74 (8th Cir.1988) (citations omitted) (brackets in original).

However, the Court of Appeals for this circuit has also held that the court, in ruling on the motion for summary judgment, must give the non-moving party "the benefit of all the reasonable inferences that can be drawn from the underlying facts." *Fischer v. NWA, Inc.,* 883 F.2d 594, 598–99 (8th Cir. 1989) (*citing Trnka v. Elanco Products Co.,* 709 F.2d 1223, 1225 (8th Cir.1983)).

## III. DISCUSSION

Plaintiffs filed their motion for summary judgment on July 23, 1997. Plaintiffs assert in their motion that there are no genuine

---

**2.** Arkansas Code § 7–6–224 permits municipalities, counties and townships to set contribution limits for local candidates at amounts lower than those imposed by the state law.

issues of material fact and that plaintiffs are entitled to judgment as a matter of law on all of their claims.

### A. Plaintiffs' Objection to Inadmissible Evidence

■ Plaintiffs object[3] to various exhibits attached to the *Brief in Support of Defendants' Response to Plaintiffs' Motion for Summary Judgment*, on the basis that the exhibits constitute inadmissible hearsay and as such, may not be considered by the court under Rule 56(e) of the Federal Rules of Civil Procedure. Specifically, plaintiffs' object to the following exhibits:

. EXHIBIT "2"—a portion of Ron Russell's deposition testimony taken July 3, 1997, in the case of *Russell v. Burris.*

EXHIBIT "3"—defendants-intervenors' responses to interrogatories and requests for production of documents in the case of *Russell v. Burris.*

EXHIBIT "4"—defendants' responses to interrogatories and requests for production of documents in the case of *Russell v. Burris.*

EXHIBIT "5"—a study from the Institute for Southern Studies, dated February 4, 1993.

EXHIBIT "6"—a form solicitation letter from three PACs, dated March 22, 1996.[4]

■ Plaintiffs assert that the exhibits constitute inadmissible hearsay under Rule 802 of the Federal Rules of Evidence. Rule 802 states that hearsay is not admissible except as provided by the Federal Rules of Evidence. Fed.R.Evid. 802. Plaintiffs contend that defendants' exhibits do not fall within any of the hearsay exceptions found in Rule 803. Plaintiffs argue that because defendants' exhibits contain inadmissible hearsay statements, the exhibits fail to conform to Rule 56(e) and cannot be used to oppose summary judgment. We agree.

Defendants do not deny that the exhibits contain hearsay. However, defendants assert that Rule 56(e) permits a party to use any of the evidentiary materials listed in Rule 56(c), which include depositions and responses to interrogatories, to oppose a motion for summary judgment. Defendants contend that because Exhibits 2, 3 and 4, fall within the type of evidentiary materials listed in Rule 56(c), they should be considered by the court in ruling on the summary judgment motion. Defendants assert that Exhibit 5 is "simply an academic paper attached to the pleadings for ready and convenient access to the court." *Defendants' Response to Plaintiffs' Objection to Inadmissible Evidence in Support of the Defendants' Response to Plaintiffs' Motion for Summary Judgment,* at 3.

Federal Rule of Civil Procedure Rule 56(e) requires that:

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R.Civ.P. 56 *advisory committee's notes.*

The United States Supreme Court discussed the burden on the nonmoving party in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court stated that, "Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and

---

**3.** Defendants contend that the proper procedural vehicle for plaintiffs' objection is a motion to strike, therefore, defendants assert that plaintiffs' objection should be denied for failure to plead properly. "[T]he technical name given a motion challenging a pleading is of little importance inasmuch as prejudice hardly can result from treating a motion that has been inaccurately denominated [an objection to evidence] as a [motion to strike]." 5A Wright & Miller, § 1380 at

645–46 (footnote omitted). Further, plaintiffs' objection satisfies the technical requirements of the Federal Rules of Civil Procedure. *See* Fed. R.Civ.P. 7 & 12(f).

**4.** Defendants concede in their response to plaintiffs' objection that Exhibit "6" should be stricken. Thus, the court will not consider Exhibit "6" in determining whether summary judgment is proper in this case.

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*, 477 U.S. at 324, 106 S.Ct. at 2553. The Court also made the following statements:

> [w]e do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves....

*Id.* However, "[t]he Celotex statement does not alter the rule that hearsay evidence alone may not defeat a summary judgment motion." *Financial Timing Publications, Inc. v. Compugraphic Corp.,* 893 F.2d 936, 942 n. 6 (8th Cir.1990), *declined to follow on other grounds, Chicago Ins. Co. v. Farm Bureau Mut. Ins. Co. of Arkansas, Inc.,* 929 F.2d 372 (8th Cir.1991).

 Exhibit 2 is a portion of Ron Russell's deposition testimony in which he states that there is high percentage of candidates who do not run for office because those potential candidates fear they won't have the ability to raise the necessary funds to finance a campaign. If Ron Russell were called to testify at trial, his testimony would still constitute hearsay because the statement tends to prove the truth of the matter asserted— that Arkansas' campaign contribution limits are justified. Thus, although deposition testimony may be used to oppose a summary judgment motion, even though it is not in a form that would be admissible at trial, it must contain testimony that if offered at trial would be admissible. Therefore, the portion of Ron Russell's deposition testimony attached as Exhibit 2 is stricken and will not be considered by the court.

 Defendants assert that Exhibits 3 and 4 prove that prior to drafting the Act, its proponents examined the manner in which campaigns in Arkansas were financed. Both exhibits contain photocopies of various press releases, newspaper articles, flyers, letters, memorandums, and other papers. Most of the documents, except for the newspaper articles, were prepared by CCG—a coalition of Arkansas organizations, including ACORN. The documents promoted passage of the Act and contained information regarding political contributions in recent Arkansas elections.

Exhibit 5 was a study conducted by the Institute for Southern Studies that found people are more likely to vote in states that make registration easy while tightly regulating political contributions.

The Court of Appeals for the Eighth Circuit has indicated its belief that some documents are sufficiently reliable that they may be relied upon when viewing the record as a whole. *Westborough Mall, Inc. v. City of Cape Girardeau, Mo.,* 693 F.2d 733, 738 n. 2 (8th Cir.1982). However, having reviewed all of the evidence contained in Exhibits 3, 4 and 5, we conclude plaintiffs are correct with regard to the contents of the exhibits. The documents consist of hearsay and are not, in the court's view, sufficiently reliable. Therefore, we sustain plaintiffs' objection to inadmissible evidence in full and strike exhibits 2, 3, 4, 5 and 6 from the record.

 We note that intervenors' exhibits contain some of the same information as defendants' exhibits 3, 4 and 5. However, plaintiffs have failed to object to intervenors exhibits, thus, the court may consider such evidence. *Walker v. Wayne County, Iowa,* 850 F.2d 433, 435 (8th Cir.1988).

### B. Plaintiffs' Motion for Summary Judgment Standing

Initially we must address defendants' contention that plaintiffs do not have standing to challenge the constitutionality of Arkansas' campaign finance laws. Defendants state in their brief that, "[i]t is questionable at this point whether the plaintiffs have standing to assert their claims at all." *Brief in Support of Defendant's Response to the Plaintiffs' Motion for Summary Judgment,* at 7. We have already ruled, however, in a Memorandum Opinion dated July 11, 1997, that plaintiffs have standing to bring their claims. Therefore, we will not address defendants' arguments on the issue of plaintiffs' standing.

 However, defendants also contend that plaintiffs do not have standing to assert the rights of candidates. Plaintiffs state in

their brief that certain sections of Arkansas' campaign finance laws infringe on a candidate's First Amendment rights to receive free speech. Defendants argue that because neither of the plaintiffs are candidates, they lack standing to bring a First Amendment claim on behalf of the candidates.

Plaintiffs contend that they possess standing to challenge the constitutionality of the Act on behalf of the candidates. Plaintiffs attempt to rely on *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) and *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988), as support for their contention. However, those cases are inapplicable because they focus on the issue of the overbreadth doctrine.[5]

Third party standing should be distinguished from the right sometimes granted a litigant to challenge a statute as overbroad. 1 Rotunda & Novak, § 2.13 at 221.

> In overbreadth cases, the litigant challenges a statute on its face because, it is argued, while a narrowly drawn statute could constitutionally prohibit his activity, the challenged statute is overbroad and appears to include activity which is constitutionally protected. The actual litigant before the Court in such cases is injured because the Court finds he has a right to be prosecuted only under a statute that is narrowly drawn. In third party standing cases, the litigant claims that the law as applied injures not only him but a third party.

*Id.*

Therefore, the issue of whether plaintiffs have standing to assert the rights of candidates is more properly decided under the theory of third party standing. "While '[o]rdinarily, one may not claim standing ... to vindicate the constitutional rights of some third party,' *Barrows v. Jackson*, 346 U.S.

249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953), that requirement is not jurisdictional but is 'only a rule of practice' which may be 'outweighed by the need to protect the fundamental rights which would be denied.'" *Irving v. Clark*, 758 F.2d 1260, 1267 (8th Cir. 1985) (*quoting Barrows*, 346 U.S. at 257, 73 S.Ct. at 1035). The Eighth Circuit recognized that "[s]tanding to raise third-party rights, or jus tertii, ... is to be distinguished from 'injury in fact' standing, which is mandated by the case or controversy requirement of article III of the Constitution and which is jurisdictional." *Id.* at 1267 n. 12 (citing *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976) (plurality opinion)). As we stated above, we have already determined that plaintiffs have Article III standing to bring their claims. Thus, the issue is whether plaintiffs have standing to assert the claims of candidates.

"In order to avoid unnecessary or imprudent adjudications, we ordinarily prohibit litigants from raising the claims of third parties not before the court." *Stiles v. Blunt*, 912 F.2d 260, 265 (8th Cir.1990) (citation omitted).

"The Supreme Court has suggested two factors to be considered in determining when the third-party rule should be suspended: the relationship of the litigant to the person whose right he seeks to assert, and the ability of the third party to assert his own right." *Irving*, 758 F.2d at 1267 (citations omitted). Plaintiffs have not established any special relationship that warrants allowing them to assert the rights of candidates. Furthermore, any candidate is fully capable of asserting his or her own rights and could bring a claim challenging the constitutionality of the Act. "The prohibition of third party standing is relaxed when the litigant is 'the only effective adversary' of the third party's rights." *Stiles*, at 265 (*quoting Barrows*, 346 U.S. at 259, 73 S.Ct. at 1036). Plaintiffs have

---

5. "An overbroad statute is one that is designed to burden or punish activities which are not constitutionally protected, but the statute includes within its scope activities which are protected by the first amendment." 4 Ronald D. Rotunda & John E. Novak, *Treatise on Constitutional Law*, § 20.8 at 26 (2d ed.1992) (footnote omitted). As the plaintiffs point out, the effect of the overbreadth doctrine is to enable persons who are

unharmed by the defect in a statute to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court. *See generally*, *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), *superseded by statute on other grounds in Bauers v. Cornett*, 865 F.2d 1517 (8th Cir.1989).

not explained why no candidate has joined this lawsuit or why plaintiffs are the only effective advocate of the candidates' rights. Thus, we conclude plaintiffs do not have standing to challenge the Act on behalf of the candidates whose First Amendment rights may or may not be infringed.

We now turn to the issue of whether there is a genuine issue of material fact regarding the constitutionality of the contribution limits imposed by Arkansas' campaign laws.

*Campaign Contribution Limitations*

Arkansas Code § 7–6–201 defines a "prohibited political action committee" (a "prohibited PAC") as any person[6] who does not meet the requirements of an "approved political action committee" (an "approved PAC"). Ark.Code. Ann. § 7–6–201(10) (Michie Repl. 1993). An approved PAC is any person who receives contributions from one or more persons in order to make contributions to candidates, and does not accept contributions in excess of $200 from any person in any calendar year. Ark.Code Ann. § 7–6–201(9). It is unlawful for any candidate to accept contributions from a prohibited PAC, and for any prohibited PAC to make contributions to a candidate. Ark.Code Ann. § 7–6–203(e) (Supp.1995). We will refer to this contribution limit as the "$200 limit."[7]

An "independent expenditure committee" is defined as any person who receives contributions from one or more persons in order to make an independent expenditure. Campaign Contribution Limits and Disclosure Act, sec. 1,[8] § 7–6–201(14). An independent expenditure is any expenditure which "expressly advocates the election or defeat of a clearly identified candidate for office" and is made without any cooperation between the candidate and the person making the expenditure. Campaign Contribution Limits and Disclosure Act, sec. 1, § 7–6–201(13). It is unlawful for any independent expenditure committee to accept any contributions in excess of $500 from any person in any calendar year. Campaign Contribution Limits and Disclosure Act, sec. 3, § 7–6–203(k). We will refer to this contribution limit as the "$500 limit."

Under the Act, it is unlawful for any candidate for any public office, except for certain enumerated statewide offices, to accept campaign contributions in excess of $100 per election, and for any person to make a contribution to such candidates in excess of $100[9] per election. Campaign Contribution Limits and Disclosure Act, sec. 2, § 7–6–203(a), (b). We will refer to this contribution limit as the "$100 limit."

Under the Act, it is unlawful for any candidate for the office of Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General, and Commissioner of State Lands, to accept contributions in excess of $300 per election, and for any person to make a contribution to such candidates in excess of $300 per election. Campaign Contribution Limits and Disclosure Act, sec. 2, § 7–6–203(a)(2), (b)(2). We will refer to this contribution limit as the "$300 limit."

Thus, plaintiffs attack Arkansas' contribution limits in four places: (1) the $200 contribution limit to PACs; (2) the $500 contribution limit to independent expenditure committees; (3) the $100 contribution limit to most candidates for public office; and (4) the $300 contribution limit to candidates for statewide public office positions.

6. Person is broadly defined under the statute as "any individual, proprietorship, firm, partnership, joint venture, syndicate, labor union, business trust, company, corporation, association, committee, or any other organization or group of persons acting in concert." Ark.Code Ann. § 7–6–201(1).

7. The $200 limit predates the Act.

8. The Campaign Contribution Limits and Disclosure Act has not yet been codified. All references to code sections are taken directly from the Act.

9. Prior to the Act, Arkansas Code § 7–6–203(a) and (b) prohibited any candidate for public office from accepting contributions in excess of $1,000, and any person from making a contribution to any candidate for public office in excess of $1,000. Ark.Code Ann. § 7–6–203 (Supp.1995), *amended by* Campaign Contribution Limits and Disclosure Act, sec. 2, § 7–6–203(a), (b). Further, under the old version of Arkansas Code § 7–6–203, there was no distinction between candidates, i.e. all candidates for any public office in Arkansas were held to the same contribution limits.

**1220**

### General Principles

■■■■ "When considering whether a campaign finance law unconstitutionally infringes freedom of speech, this Court's task is to decide whether the provision in question actually 'burdens the exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling state interest.' "[10] *Shrink Missouri Government PAC v. Maupin,* 71 F.3d 1422, 1424 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996), (quoting *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 657, 110 S.Ct. 1391, 1396, 108 L.Ed.2d 652 (1990)) (*citing Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam)); *see also, Day v. Holahan,* 34 F.3d 1356, 1361, (8th Cir.1994) *cert. denied,* 513 U.S. 1127, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995).

Therefore, the first issue we must address is whether the contribution limitations infringe on plaintiffs' First Amendment rights, or more precisely, whether a genuine issue of material fact exists on the issue. *Service Employees Int'l Union, AFL–CIO, CLC v. Fair Political Practices Comm'n,* 721 F.Supp. 1172, 1175 (E.D.Cal.1989), aff'd, 955 F.2d 1312 (9th Cir.1992). The Eighth Circuit recognized that "it is clear that state-enforced limits on campaign contributions ... stifle First Amendment freedoms." *Day,* 34 F.3d at 1365 (*citing Buckley,* 424 U.S. at 19, 22, 96 S.Ct. at 634, 636). The Court in *Buckley* stated that:

> contribution ... limitations operate in an area of the most fundamental First Amendment activities.... The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by people."

*Buckley,* 424 U.S. at 14, 96 S.Ct. at 632 (*quoting Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)). "[B]ecause the [contribution] limit applies to contributions both by and to political committees ... the limit affects not only free political speech but also free association...." *Day,* 34 F.3d at 1365.

■■■■ Thus, there can be no question that Arkansas' contribution limitations infringe on plaintiffs' First Amendment rights to free speech and free association. However, in order for plaintiffs to succeed on summary judgment, plaintiffs must demonstrate that no genuine issue of material fact exists as to whether the contribution limitations are narrowly tailored to meet a compelling state interest.

■■■■ Defendants state in their brief that the state has a compelling interest in preventing corruption or the appearance of corruption resulting from large campaign contributions.[11] It is well established that the state's interest in preventing corruption or the appearance of corruption that could result from large contributions is a compelling state interest. *Day,* 34 F.3d at 1365. "It is unnecessary to look beyond the Act's primary purpose—to limit the actuality and appearance of corruption resulting from large

**10.** Although defendants concede in their brief that the Eighth Circuit has unequivocally held that strict scrutiny applies to constitutionality of campaign contribution limitations, defendants state that it is their position that intermediate scrutiny applies in this case. However, based on the Eighth Circuit's analysis of the Supreme Court's decisions in this area, strict scrutiny applies in cases involving contribution limits. Therefore, we will apply strict scrutiny in this case.

**11.** Defendants also offer two other interests in support of the contribution limitations: (1) the state's interest in protecting the Equal Protection rights of voters and candidates and (2) the Commission's interest in protecting the First Amendment rights of voters and candidates to "full participation in the political marketplace of ideas." *Brief in Support of Defendants' Response to the Plaintiffs' Motion for Summary Judgment,* at 20. To the extent that these interests serve the state's purpose of "leveling the playing field," they are invalid. The court in *Buckley* stated that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment. ...." *Buckley,* 424 U.S. at 48–49, 96 S.Ct. at 648–49. "[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." *Federal Election Comm'n v. National Conservative Political Action Committee,* 470 U.S. 480, 496–97, 105 S.Ct. 1459, 1468, 84 L.Ed.2d 455 (1985). Therefore, we reject defendants submission of compelling state interests other than the one identified by the United States Supreme Court.

individual financial contributions—in order to find a constitutionally sufficient justification for the ... contribution limitation." *Buckley,* 424 U.S. at 26, 96 S.Ct. at 638.

In a recent Eighth Circuit case, the court struck down a district court's decision that the state had a compelling interest in limiting *all* campaign contributions. *Carver v. Nixon,* 72 F.3d 633, 639 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996). The court stated that the compelling interest identified in *Buckley* was in limiting large campaign contributions.

> The district court held that "[u]nder *Buckley,* Missouri clearly has a compelling state interest in limiting campaign contributions." The district court's decision substantially broadens the compelling interest identified in *Buckley.* The district court erred as a matter of law in extending *Buckley* to the infinitely broader interest of limiting all, not just large, campaign contributions.

*Carver,* at 639 (citation omitted). Thus, it is clear that the only compelling state interest that justifies contribution limitations is the state's need to avoid corruption or the appearance of corruption in the political process that could result from *large* contributions to candidates.

Although each of the contribution limits challenged by plaintiffs involves the same constitutional analysis, we will address each limit separately.

### The $200 Limit [12]

 Plaintiffs contend in their brief that no compelling state interest exists to justify the $200 limit because "contributions to PACs do not threaten to corrupt the political process because there does not exist an opportunity for a *quid pro quo* arrangement since the contribution is to the PAC and not [to] a candidate." *Memorandum in Support of Plaintiffs' Motion for Summary Judgment,* at 21 (citing *National Conservative Political Action Committee ("NCPAC"),* 470 U.S. at 496–97, 105 S.Ct. at 1469–70). Plaintiffs' reliance on the Supreme Court's decision in *NCPAC is* misplaced. *NCPAC*

involved restrictions on independent expenditures. The Supreme Court has held that "there [is] a fundamental constitutional difference between money spent to advertise one's views independently of the candidate's campaign and money contributed to the candidate to be spent on his campaign." *Id.* 470 U.S. at 497, 105 S.Ct. at 1469.

> "Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate."

*Id.* (quoting *Buckley,* 424 U.S. at 47, 96 S.Ct. at 658). Thus, restrictions on independent expenditures are generally not justified by a state's need to prevent actual or apparent corruption that could result from a large contribution being given for a political *quid pro quo* from a candidate. *See Buckley,* at 45, 53–54, 96 S.Ct. at 647, 651–52.

However, the Supreme Court recognized in *California Medical Ass'n v. Federal Election Comm'n,* 453 U.S. 182, 197, 101 S.Ct. 2712, 2722, 69 L.Ed.2d 567 (1981), that contributions to PACs implicate the state's interest in preventing the actual or apparent corruption of the political process. The Court reasoned that an individual could evade the contribution limits to candidates by channeling funds through a PAC. *Id.*

 In addition, the Eighth Circuit has recognized that a state has a compelling interest in limiting contributions to PACs. *Day,* 34 F.3d at 1365. Thus, we reject plaintiffs' argument that there is no compelling state interest that could justify the $200 limit, and we conclude that a genuine issue of material fact exists as to whether Arkansas' interest in preventing actual or apparent corruption in the political process that could result from large contributions to PACS is a compelling state interest.

---

**12.** This issue was before the court in *Russell v. Burris.* The court upheld the $200 limit as constitutional. The court in *Russell* found impressive the fact that the $200 limit has been in effect since 1990 and found that the $200 limit had not prevented PACs from amassing the necessary resources for effective advocacy. *Russell v. Burris,* 978 F.Supp. at 1225–26 (E.D.Ark.1997).

However, as the court in Day pointed out, "the fighting issue here is whether [the] ... limit on contributions to political committees ... is narrowly tailored to serve the state's interest, given the burden it imposes on political speech." *Day*, 34 F.3d at 1365 (citation omitted). In *Day*, the court found that the $100 annual limit on contributions to a political committee was "too low to allow a meaningful participation in protected political speech and association, and thus [was] not narrowly tailored to serve the state's legitimate interest in protecting the integrity of the political system." *Id.*, at 1366. The court relied on the fact that 25 to 33 percent of the contributions to political committees in the most recent election exceeded the $100 limit and that, after adjusting for inflation, the $100 limit equalled about 4% of the $1,000 limit in *Buckley*. *Id.* Based on those facts, the court found that the $100 contribution limit significantly impaired the ability of political committees to exercise their First Amendment rights.

The Court in Buckley recognized that "[g]iven the important role of contributions in financing political campaigns, contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21, 96 S.Ct. at 636. The Court concluded, however, that there was no indication that the $1,000 limit would have any "dramatic adverse effect on the funding of campaigns and political associations." *Id.* The Court did not hold that the $1,000 limit was the constitutional minimum.

In the most recent Eighth Circuit decision on the issue, the court struck down as invalid a statute that imposed contribution limits of $100—$300 per election cycle.[13] In *Carver v. Nixon*, the court again looked at the fact that the $100 and $300 limits at issue were dramatically lower than the $1,000 limit in *Buckley*. The court addressed whether the limit was necessary to remedy the corruption caused by large campaign contributions. The only evidence of corruption presented at trial in *Carver* was a $420,000 contribution from a Morgan Stanley PAC to various races in northern Missouri. *Id.*, at 642. The court held that the $420,000 contribution was a far cry from the $100—$300 limits imposed by Missouri's laws and found that the contribution limits were not in anyway narrowly tailored to remedy actual or apparent corruption caused by large contributions. *Id.*

Prior to the Act, Arkansas' contribution limits were set at the $1,000 limit recognized by *Buckley* as constitutional. Arkansas voters, in passing the Act, determined that the $1,000 limit was no longer effective to combat actual or apparent corruption in the political process that could result from large campaign contributions. However, the Supreme Court in *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 295, 102 S.Ct. 434, 437, 70 L.Ed.2d 492 (1981), held that "[i]t is irrelevant that the voters rather than a legislative body enacted [a statute], because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation."

We conclude that whether the $200 limit is narrowly tailored to serve the state's interest in preventing corruption is a question of fact. As stated above, a genuine issue of material fact exists as to whether the state has a legitimate interest in restricting contributions to PACs in order to prevent actual or apparent corruption that could result from large contributions. Plaintiffs have not presented any evidence demonstrating that no genuine issue of material fact exists as to whether the $200 limit is narrowly tailored to meet Arkansas' need to prevent actual or apparent corruption in the political process, other than to point out that the $200 limit is 1/5th of the $1,000 limit upheld in *Buckley*. Therefore, we conclude, plaintiffs are not entitled to summary judgment on this issue.

### The $500 Limit [14]

▄▄▄ The $500 limit is a restriction on the amount of money a person can contribute to

---

**13.** In *Carver,* the Missouri statute at issue imposed a $100 per election cycle per candidate limit in districts with fewer than 100,000 residents; a $200 per election cycle per candidate, other than statewide candidates, in districts with 100,000 or more residents; and a $300 per election cycle per statewide candidate.

**14.** This issue was before the court in *Russell v. Burris,* however, the court ruled that the plain-

an independent expenditure committee. As stated above, an independent expenditure committee is a person who receives contributions from one or more persons in order to make an independent expenditure. "It is clear that independent expenditures are protected speech." *Day*, 34 F.3d at 1360. Furthermore, independent expenditures, unlike contributions, provide little assistance to the candidate's campaign, and the absence of prearrangement and coordination of an expenditure with the candidate alleviates the danger that expenditures will be given as a *quid pro quo*. Thus, as the Court in *Buckley* held, the state's interest in preventing corruption in the political process is not sufficient to justify a ceiling on independent expenditures.

Although the $500 limit is a limit on contributions, it is a limit on contributions to "independent expenditure committees." The Court permits restrictions on contribution limits because such restrictions directly address the problem of large contributions given to secure political *quid pro quo* from current and potential office holders. *Buckley*, 424 U.S. at 26–27, 96 S.Ct. at 638–39. At first glance, the $500 limit does not seem to address that concern.

A contribution to an independent expenditure committee cannot legally be channeled to the candidate. In other words, a contributor cannot evade the candidate contribution limits by contributing money to an independent expenditure committee because an independent expenditure committee uses its funds to make independent expenditures—without any cooperation from the candidate or his committee. Thus, defendants and intervenors assertion that the $500 limit deters corruption by preventing persons from circumventing the candidate contribution limits is misleading. Although contributions to PACs implicate the state's interest in preventing such corruption, contributions to independent expenditure committees may not.

We think it is important to note that under the Act a person or group of persons are not prohibited from registering themselves as both an independent expenditure committee and a PAC. Thus, if the same person or organization registers with the Secretary of State as both an independent expenditure committee and a PAC, then it is possible that contributions made to such an organization may be channeled to a candidate.

Nevertheless, because a contribution limitation "entails only a marginal restriction upon the contributor's ability to engage in free communication," a state can impose a contribution limitation if a compelling state interest exists. *Buckley*, 424 U.S. at 20–21, 96 S.Ct. at 635. Therefore, we conclude that a genuine issue of material fact exists as to whether the $500 limit is narrowly tailored to serve a compelling state interest.

### The $100 Limit and the $300 Limit [15]

Plaintiffs state in their brief that the $100 limit and the $300 limit unconstitutionally infringe on their First Amendment rights. Specifically, plaintiffs contend that the contribution limits of Arkansas Code § 7–6–203 are not narrowly tailored to advance the state's interest in preventing corruption in the political process.

Plaintiffs compare the limits imposed by § 7–6–203 to the $1,000 limit of *Buckley* and argue that the Arkansas' limits are too low to allow meaningful participation in the political process. In addition, plaintiffs point to the fact that the Eighth Circuit has struck down, in *Day* and *Carver*, $100 and $300 contribution limits as unconstitutional.

Finally, plaintiffs contend that the Act violates the Equal Protection Clause of the Fourteenth Amendment because it treats similarly situated persons differently. Specifically, the Act allows small donor PACs to contribute up to $2,500 to each candidate per election, while it limits individuals and other PACs to $100 and $300 per election to each candidate. Plaintiffs state that individuals and PACs are no more likely than small donor PACs to corrupt the political process. Plaintiffs contend that Arkansas Code § 7–6–

---

tiffs in that case lacked standing to bring this claim.

**15.** This issue was before the court in *Russell v. Burris*. The Honorable Wm. R. Wilson Jr. declared the $300 limit unconstitutional, but he upheld the $100 limit, except as it applied to the office of Supreme Court Justice and Court of Appeals Judge.

203 penalizes those who wish to associate with approved PACs.

In response to plaintiffs' equal protection claim, defendants assert that nothing prevents plaintiffs from forming their own small donor PAC, separate and apart from their approved PAC, and attaining the ability to contribute up to $2,500 to candidates. Defendants point to the fact that small donor PACs are limited to $25 annual contributions from supporters, while approved PACs may receive up to $200 per year from a contributor.

Defendants contend that even if discrimination between the two parties exist, the discrimination is justified by three reasons: (1) the $2,500 contribution limit is narrowly tailored to alleviate corruption or the appearance of corruption flowing from large political contributions; (2) the small donor PACS are justified because they provide the perfect vehicle for candidates of lesser means to receive funding and for voters of lesser means to participate in the political process; and (3) the Act allows substantial participation by approved PACs by allowing those PACs to contribute $100 to $300 per election to a candidate.

As we stated above, the court in *Buckley* held that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley*, 424 U.S. at 48–49, 96 S.Ct. at 648–49. "[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." *National Conservative Political Action Committee*, 470 U.S. at 496–97, 105 S.Ct. at 1468. Therefore, we reject defendants' second offered justification.

In *California Medical Ass'n*, the Court addressed a similar equal protection claim. Under the Federal Election Campaign Act of 1971, as amended in 1974 (the "federal Act"), contributions to corporations and labor unions are not restricted, while contributions to PACs are limited. The Court held that:

> [i]n order to conclude that [the statute]. violates the equal protection component of the Fifth Amendment, we would have to

find that because of this provision the Act burdens the First Amendment rights of persons subject to [the statute] to a greater extent than it burdens the same rights of corporations and unions, and that such differential treatment is not justified.

*California Medical Ass'n*, 453 U.S. at 200, 101 S.Ct. at 2724. The Court found no discrimination, holding that the federal Act places far fewer restrictions on individuals and PACs than it does on corporations and labor unions.

Similarly, in this case, the Act imposes a $25 limit on contributions to small donor PACs, while persons may contribute up to $200 to approved PACs. Further, even if plaintiffs could prove that the Act burdened the rights of persons who wanted to contribute to approved PACs to a greater extent than it burdened the rights of persons who wanted to contribute to small donor PACs, we believe that the state may be justified. The fact that a person can only contribute up to $25 to small donor PACs "greatly diminishes the potential for actual or perceived corruption that can accompany contributions from approved PACs." *Russell*, 978 F.Supp. at 1227. Therefore, we deny plaintiffs' motion for summary judgment on its equal protection claim.

In determining whether summary judgment is proper on the issue of whether the $100 and $300 limits are unconstitutional because they are not narrowly tailored to serve a compelling state interest, we must decide whether plaintiffs have met their initial burden of proving that the contribution limits are unconstitutional. There is no question that the $100 and $300 contribution limits impinge on plaintiffs' First Amendment rights. Further, it is well established that the state's interest in preventing actual or perceived corruption in the political process is a compelling state interest that may be sufficient to justify a narrowly tailored statute. Thus, the key issue is whether the $100 and $300 limits are narrowly tailored to serve the state's compelling interest in preventing corruption in Arkansas' political process.

In support of their summary judgment motion, plaintiffs rely on the fact that the $100 limit and the $300 limit are dramatically

lower than the $1,000 limit upheld in *Buckley*. However, as stated above, the Court in *Buckley* did not hold that the $1,000 limit was the constitutional minimum. Thus, although the $1,000 limit gives the court some guidance on what limit may be appropriate, it is not determinative of the issue. As the Eighth Circuit has recognized, the question is whether the limit is too low to allow meaningful participation in Arkansas' political process.

Defendants contend that the limits are not too low. Defendants point to a statistical analysis complied by Robert M. Stern, Co-Director and General Counsel to the Center for Governmental Studies, a non-profit research organization, attached as Exhibit 1 to their brief. Mr. Stern was retained by the Commission as an expert in the area of campaign finance reform. Mr. Stern states in his affidavit that levels of campaign contributions and fundraising in Arkansas are significantly lower than those prevalent in other areas. *Declaration of Robert M Stern*, at ¶ 9. Specifically, the analysis concludes that the average amount of money raised in a general election by a candidate running for state representative during the 1992–96 election years was $7,545. For a candidate running for state senate, the average was $31,408, and for a candidate running for the office of governor, it was $916,490. *Defendants' Exhibit 1*, at 1–8.

Defendants contend that because it costs so little to run an effective campaign in Arkansas, lower contribution limits are necessary to prevent corruption. Defendants argue that a $1,000 contribution is a *large* contribution in Arkansas' political campaigns, and, as such, a $1,000 contribution could be given to achieve a political *quid pro quo* from a candidate or officeholder.

■ We agree with defendants' argument as it relates to the offices of state representative and state senator, however, we do not agree as it relates to a candidate running for the office of governor. By defendants' own evidence, a candidate would have to collect approximately one million dollars to run an effective campaign for the office of governor of the State of Arkansas. Furthermore, over one-half of the contributions made to candidates for the office of governor were greater than the $300 limit imposed by the Act. A per election limit of $300 on contributions to candidates for the position of governor is too low to allow meaningful participation in the political process, and significantly impairs a candidate's ability to collect the necessary funds to run an effective campaign for the office of governor. Thus, it is not narrowly tailored to serve the state's legitimate interest in preventing corruption in the political process. Therefore we conclude, that Arkansas Code § 7–6–203(a), as it applies to the office of governor, is unconstitutional.

Because plaintiffs have not put forth any evidence of whether the $300 limit is unconstitutional as it applies to the other enumerated offices contained in Arkansas Code § 7–6–203(a), we deny plaintiffs' motion for summary judgment as it applies to the offices of Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General, and Commissioner of State Lands.

■ Plaintiffs argue that the $100 limit amounts to a "difference in kind" rather than a "difference in degree," citing to the Supreme Court's decision in *Buckley*, where the Court held that as long as the reviewing court is satisfied that some limit on contributions is necessary, it need not determine the precise amount which would effectuate the government's compelling interest. *Buckley*, 424 U.S. at 30, 96 S.Ct. at 640. We have "no scalpel to probe" whether a higher ceiling might not serve as well as the $100 contribution limit passed by the Act. *Id.* (citation omitted). "Such distinctions in degree become significant only when they amount to differences in kind." *Buckley*, 424 U.S. at 30, 96 S.Ct. at 640.

In *Carver*, the court held that the contribution limits were a "difference in kind." The court stated that the limits were not closely drawn to reduce corruption or the appearance of corruption associated with large campaign contributions. *Carver*, 72 F.3d at 643.

In ruling that the contribution limits in *Buckley* were narrowly tailored, the Supreme Court pointed out that only about five percent of the contributors in the 1974 election gave more than the $1,000 limit. The State's own evidence shows that a much higher percentage of contributors

will be impacted by the limits in Proposition A.

*Id.*

Similarly, in this case, defendants' own evidence shows that well over one-half of the contributions made during the 1992–96 elections were contributions in excess of $100. Thus, over fifty percent of the contributors to the 1992–96 elections will be affected by the contribution limits.

Defendants argue that a $100 limit allows meaningful participation in an Arkansas election given the amount of money it costs to run an effective campaign. We believe that there is a genuine issue of material fact as to whether a $100 limit is constitutional. A reasonable person could conclude that a $1,000 contribution is a sufficiently large enough contribution that it could cause corruption or the appearance of corruption in Arkansas' political process. Therefore, a genuine issue of material fact exists as to whether the $100 limit is narrowly tailored to serve a compelling state interest.

### Disclosure Requirement for Independent Expenditures [16]

Under the Act, "[a]ny person making an independent expenditure shall name and identify itself ... in all of its communications with the public concerning any candidate and such communications must include ... the following notice: This communication is not authorized by any candidate or candidate committee." Campaign Contribution Limits and Disclosure Act, sec. 9, § 7–6–221(a). As stated above, an independent expenditure is any expenditure which is not a contribution and "expressly advocates the election or defeat of a clearly identified candidate for office" and is made without any cooperation between the candidate and the person making the expenditure. Campaign Contribution Limits and Disclosure Act, sec. 1, § 7–6–201(13).

Plaintiffs contend that the above statute infringes upon the First Amendment rights of ARL.[17] Specifically, plaintiffs assert that there is no compelling state interest for Ark. Code. § 7–6–221, and even if a compelling state interest does exist, it is not narrowly tailored to meet the state's need. In addition, plaintiffs contend that Arkansas Code § 7–6–221 is a content-based infringement on ARL's First Amendment rights, and, as such, is unconstitutional on its face.

Plaintiffs rely on the United States Supreme Court's decision in *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), for the proposition that "a mandated disclaimer on any writing intended to 'influence' an election is unconstitutional." *Memorandum in Support of Plaintiffs' Motion for Summary Judgment*, at 25. The question before the Court in *McIntyre* was "whether an Ohio statute [18] that prohibit[ed] the distribution of anonymous campaign literature [was] a 'law abridging the freedom of speech' within the meaning of the First Amendment." *Id.*, 514 U.S. at 336, 115 S.Ct. at 1514 (footnote and citations omitted).

The Court in *McIntyre* recognized that an "author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.*, 514 U.S. at 342, 115 S.Ct. at 1516. The freedom to publish anonymously "extends beyond the literary realm" and "encompasses documents intend-

---

**16.** This issue was not before the court in *Russell v. Burris*.

**17.** Plaintiff Linane does not claim that she intends to make an independent expenditure in the future, thus, plaintiffs assert that Ark.Code § 7–6–221 only violates ARL's First Amendment right.

**18.** The relevant portion of the Ohio statute provided that:

No person shall write, print, post, or distribute ... a notice, placard, dodger, advertisement, sample ballot, or any other form of general publication which is designed to promote the nomination or election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any election, or make an expenditure for the purpose of financing political communications through newspapers, magazines, outdoor advertising facilities, direct mailings. unless there appears on such form of publication in a conspicuous place ... the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the same. Ohio Rev.Code Ann. § 3599.09(A) (Banks–Baldwin 1988) (*amended by* Ohio Rev.Code Ann. § 3517.20 (Banks–Baldwin 1995)).

ed to influence the electoral process." *Id.,* 514 U.S. at 342–344, 115 S.Ct. at 1516–19. "When a law burdens core political speech we apply exacting scrutiny, and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *Id.,* at 514 U.S. at 347, 115 S.Ct. at 1519 (internal quotation marks and citation omitted).

 Thus, the disclaimer required by Arkansas Code § 7–6–221 clearly implicates ARL's First Amendment right to free speech. As a result, we must apply strict scrutiny and grant plaintiffs' motion for summary judgment if we find that no genuine issue of material fact exists regarding whether Arkansas Code § 7–6–221 is narrowly tailored to serve a compelling state interest.

The state in *McIntyre* argued that the disclosure requirement in Ohio Rev.Code Ann. § 3599.09(A) was justified by two compelling state interests: (1) preventing fraudulent and. libelous statements and (2) providing its electorate with relevant information. *Id.,* 514 U.S. at 348, 115 S.Ct. at 1519. The Court held that Ohio's interest in providing its electorate with relevant information was *"plainly insufficient* to support the constitutionality of its disclosure requirement." *Id.,* 514 U.S. at 349, 115 S.Ct. at 1520 (emphasis added). The Court accepted Ohio's interest in preventing fraud and libel as a legitimate interest, however, the court was not persuaded that it justified " § 3599.09(A)'s extremely broad prohibition."[19] *Id.,* 514 U.S. at 351, 115 S.Ct. at 1521.

In holding that the state's interest in preventing fraud and libel was insufficient, the Court pointed to the fact that § 3599.09(A) encompassed documents that were not even arguably false or misleading. In· addition, "[3599.09(A) ] applies not only to elections of public·officers, but also to ballot issues that present neither a substantial risk of libel nor any potential appearance of corrupt advantage." *Id.,* 514 U.S. at 351–52, 115 S.Ct. at 1521. Thus, according to *McIntyre,* preventing fraudulent and libelous statements in political advertising can be a compelling state interest. However, it failed to support the broad disclosure requirement of § 3599.09(A). The Court acknowledged that the state's interest may justify "a more limited identification requirement." *Id.,* 514 U.S. at 353, 115 S.Ct. at 1522. ˙

The state in *McIntyre* argued that the Court's decision in Buckley supported the constitutionality of § 3599.09(A)'s broad disclosure requirement. However, the Court rejected the state's argument and held that Buckley was not controlling.

In *Buckley,* the ˙Court upheld Section 434(e)[20] which required every person (other than a political committee or candidate) who made expenditures aggregating over $100 in a calendar year to file a statement with a Federal Election Commission.[21] *Buckley,* 424 U.S. at 75, 96 S.Ct. at 661. The Court in Buckley recognized that disclosure requirements play an important role in 'the enforcement of contribution and expenditure limitations.

> Section 434(e) is a part of Congress' effort to achieve "total disclosure" by reaching "every kind of political activity" in order to insure that the voters are fully informed and achieve through publicity the maximum deterrence to corruption and undue influence possible. The provision is responsive to the legitimate fear that efforts would be made, as they had been in the past, to avoid the disclosure requirements by routing financial support of candidates

**19.** The Court accepted Ohio's submission that its interest in preventing fraud and libel "carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large." *Id.* 514 U.S. at 349, 115 S.Ct. at 1520. The Court concluded, however, that the state had enacted other statutes to combat fraud and libel in candidate elections and, thus, was not relying solely on § 3599.09(A) to protect its interest. Therefore, the Court reasoned, even though Ohio's interest was legitimate, the Court was not persuaded that it justified § 3599.09(A)'s extremely broad prohibition.

**20.** Section 434(e) was one of the key provisions of the Federal Election·Campaign Act of 1971, as amended in 1974 (the "federal Act"), that was challenged as unconstitutional in *Buckley.*

**21.** Under the Act, Arkansas now has a similar reporting requirement that requires any person who makes an independent expenditure in excess of $500 to file a similar report with the Secretary of State. Campaign Contribution Limits and Disclosure Act, sec. 8, § 7–6–220.

through avenues not explicitly covered by the general provisions of the [federal] Act. *Id.,* 424 U.S. at 76, 96 S.Ct. at 662 (footnotes omitted). Thus, the Court in Buckley held that the government's interest in informing its electorate with relevant information in order to prevent actual or perceived corruption is a compelling state interest.

However, as the Court in *McIntyre* recognized, the disclosure requirement in *Buckley* required nothing more than an identification to the Federal Election Commission on a report of the amount and use of money independently expended in support of a candidate. In contrast, the statute in *McIntyre,* like the Arkansas statute, imposes a much greater burden on a person's right to free speech. "Though such mandatory reporting undeniably impedes protected First Amendment activity, the intrusion is a far cry from compelled self-identification on all election-related writings." *McIntyre,* 514 U.S. at 355, 115 S.Ct. at 1523.

Therefore, the Court in *McIntyre* held that the Ohio statute was unconstitutional: "[n]ot only is the Ohio statute's infringement on speech more intrusive than the *Buckley* disclosure requirement, but it rests on different and less powerful state interests." *Id.* 514 U.S. at 356, 115 S.Ct. at 1523. The Court also held that the Ohio statute was not narrowly drawn, recognizing that the *Buckley* statute only regulated candidate elections, while the Ohio statute regulated referenda and other issue-based ballot measures. *Id.*

In candidate elections, the Government can identify a compelling state interest in avoiding the corruption that might result from campaign expenditures. Disclosure of expenditures lessens the risk that individuals will spend money to support a candidate as a quid pro quo for special treatment after the candidate is in office. Curriers of favor will be deterred by the knowledge that all expenditures will be scrutinized by the Federal Election Commission and by the public for just this

sort of abuse.... In short, although Buckley may permit a more narrowly drawn statute, it surely is not authority for upholding Ohio's open-ended provision. *Id.,* 514 U.S. at 356, 115 S.Ct. at 1523–24 (footnotes omitted).

Defendants contend that the state's interest in this case in compelling disclosure under § 7–6–221 is in "holding up for *public* scrutiny the sources of support for, or opposition to, a candidate." *Brief in Support of Defendants' Response to Plaintiffs' Motion for Summary Judgment,* at 30–31. Intervenors add to that interest by asserting that the Act's disclosure provision serves the state's interest in preventing the appearance and reality of corruption and detecting violations of the contribution limits. Thus, defendants offer two justifications for Arkansas Code § 7–6–221.

In determining if a genuine issue of material fact exists as to whether there is a compelling state interest for the disclosure requirement of § 7–6–221, we find the Sixth Circuit's opinion in *Kentucky Right to Life, Inc. v. Terry,* 108 F.3d 637 (6th Cir.) *cert. denied,* —— U.S. ——, 118 S.Ct. 162, —— L.Ed.2d —— (1997), persuasive. We recognize that according to *McIntyre,* a state's informational interest is not enough to justify a broad disclosure statute like the one Ohio had enacted. However, as defendants and the court in *Kentucky Right to Life* point out, an informational interest combined with an interest in preventing corruption, may constitute a sufficient compelling state interest to support a more narrowly drafted statute. As we stated above, the Court in *McIntyre* acknowledged that a more limited statute may be justified by such state interests.

In *Kentucky Right to Life,* the court upheld a disclosure statute that requires identification of the sponsor to be placed upon every expenditure which advocates the support of or defeat of a candidate.[22] The Sixth Circuit recognized that *McIntyre* and *Buck-*

---

22. Section 121.190(1) provides in relevant part: All newspaper or magazine advertising posters, circulars, billboards, handbills, sample ballots, and paid-for television or radio announcements with reference to or intended for, the support or defeat of a candidate, slate of candidates, or group of candidates for nomination

or election to any public office shall be identified by the words "paid for by" followed by the name and address of the payer.
Ky.Rev.Stat. Ann. § 121.190(1) (Banks–Baldwin 1995), *amended by* Ky.Rev.Stat. Ann. § 121.190(1) (Banks–Baldwin 1996 Acts Issue). *Kentucky Right to Life, Inc.,* 108 F.3d at 641 n. 9.

*ley* provided the parameters for its analysis on the issue.

The challenges presented in *Buckley* and *McIntyre* can best be characterized as two points on a continuum, with plaintiffs' challenge falling somewhere between them. *Buckley* balanced substantial government interests in combatting corruption in the political process against the First Amendment infringement of reporting requirements and concluded that those interests outweighed the limited infringement. *McIntyre* then applied the reasoning of *Buckley* and concluded that the additional First Amendment burdens exacted by requiring identification disclaimers on issue advocacy expenditures outweighed the state's more limited interest in identifying proponents of issue advocacy.

*Id.,* 108 F.3d at 647–48.

The Sixth Circuit continued by recognizing that Kentucky, like the government in *Buckley,* had a substantial interest in notifying the public of the sources of expenditures along with preventing actual and perceived corruption. Further, the court realized that the Kentucky statute, like the statute in *McIntyre,* placed a more "onerous burden" on plaintiffs' First Amendment rights than the reporting requirements did in *Buckley.* Nevertheless, the court concluded that based upon the Supreme Court's holding in *Buckley,* Kentucky had shown substantial governmental interests and the identification disclaimer in § 121.190(1) was narrowly tailored to serve those goals.

The State asserts that § 121.190(1) prevents actual and perceived corruption by immediately notifying the public of any possible allegiance a particular candidate may feel toward the publisher. The State also asserts that it provides the Registry with a method of detecting those expenditures which are not truly independent by providing a paper trail to detect violations by unscrupulous PACs routing expenditures through individuals. Under Buckley, these are both substantial governmental interests. *Buckley,* 424 U.S. at 66–68, 96 S.Ct. at 657–58. Applying the analysis of

*Buckley,* we believe the identification disclaimer for independent expenditures contained in § 121.190(1) is narrowly tailored toward achieving those goals.

*Id.,* 108 F.3d at 648.

We note that plaintiffs' initial brief and reply brief do not discuss the Sixth Circuit's opinion in *Kentucky Right to Life.* They have failed to offer any reason why we should not adopt the Sixth Circuit's reasoning and apply it to the facts of this case.

In support of its summary judgment motion, plaintiffs instead rely on two district court cases involving compelled disclosure. In *Shrink Missouri Government PAC v. Maupin,* 892 F.Supp. 1246 (E.D.Mo.1995), *aff'd,* 71 F.3d 1422 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996), the court invalidated a Missouri statute that required all political advertising to contain a statement that the information in the advertisement had been approved by the candidate.[23] *Id.,* at 1254.

The state argued in *Maupin* that the Missouri statute was narrowly tailored to achieve the compelling state interest in deterring false statements by candidates. *Id.,* at 1255. The court, relying on *McIntyre,* acknowledged that the state had an interest in protecting its electorate from false statements, however, the court held that the state had failed to show "either that this desire rises to the level of a compelling need or that this statute is narrowly tailored to meet that need." *Id.* In addition, the court noted, there had been no showing by the state that false advertising by campaign committees was a problem. The court noted that the statute only applied to candidates and campaign committees, and not to PACS or lobbyists, "which are surely the source of most 'deniable' negative campaigning." *Id.*

The court in *Maupin* placed great weight on the fact that there was nothing in the statute which limited its application to false or fraudulent statements. "To the extent Missouri seeks to justify this regulation as a means of preventing fraud and false statements, it must fail for the same reason that

---

**23.** The Missouri statutes also contained a provision that required all political advertising relating to candidates or ballot issues to contain a "paid for by" legend identifying the source of the

advertising. *Id.* at 1254–55. However, the "paid for by" disclosure requirement was not before the court in *Maupin.*

the Ohio statute did. As in *McIntyre,* this provision applies 'even when there is no hint of falsity or libel.'" *Id. (quoting McIntyre,* 514 U.S. at 344, 115 S.Ct. at 1517).

The present case can easily be distinguished from the facts of *Maupin. Maupin* involved a statute which required candidates and candidate committees to place self-identification disclaimers on their own political advertising. Arkansas Code § 7–6–221 requires persons making independent expenditures, i.e., persons other than a candidate or a candidate committee, to place disclaimers on their political advertising. Thus, the statutes regulate two different types of activity. In *Maupin,* the state's goal was to prevent candidates from engaging in anonymous negative campaigning. The state's purpose in the present case is to provide its electorate with information about a candidate's possible alliances and to prevent actual or perceived corruption in the election process.

In *Stewart v. Taylor,* 953 F.Supp. 1047 (S.D.Ind.1997), the issue was whether an Indiana statute,[24] similar to the one in this case, was constitutional. The court, relying on *McIntyre,* held that the statute, like the Ohio statute in *McIntyre,* was not narrowly drawn because it applied to campaign literature that was "informative as well as misleading, innocuous as well as libelous, truthful as well as fraudulent." *Id.,* at 1055.

Defendants do not argue that the state's interest in this case is in preventing false or fraudulent statements. Thus, *Maupin* and *Stewart* are inapplicable as they deal with situations where statutes are not narrowly tailored to meet the state's need to prevent false statements in political advertising. More importantly, however, is the fact that neither case is binding precedent on this court, and we simply find that the Sixth Circuit's reasoning in *Kentucky Right to Life* is more persuasive.

Therefore, we conclude, that a genuine issue of material fact exists as to whether

there is a compelling state interest for Arkansas Code § 7–6–221. However, even if a compelling state interest exists, plaintiffs argue that Arkansas Code § 7–6–221 is not narrowly tailored to meet the state's need.

In *McIntyre,* Ohio Rev.Code Ann. § 3599.09 prohibited any person from writing, printing, posting or distributing any form of general publication designed to promote the nomination, election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any election without placing the required disclosure on the publication.

Defendants point out in their brief that Ark.Code § 7–6–221 is more narrowly drawn than the Ohio statute in *McIntyre* and only compels disclosure of an expenditure that "expressly advocates the election or defeat of a clearly identified candidate for office." Campaign Contribution Limits and Disclosure Act, sec. 1, § 7–6–201(13). Thus, defendants argue, "issue advocacy, or even party advocacy, are excluded from this definition and no reporting language need be placed on such expenditures. Only those expenditures expressing support or opposition of a candidate for office are effected." *Brief in Support of Defendants' Response to plaintiffs' Motion for Summary Judgment,* at 27–28.

We conclude that a genuine issue of material fact exists as to whether Arkansas Code § 7–6–221 is narrowly tailored to meet the compelling state interest. Thus, based on the above analysis, we conclude that plaintiffs have not met their burden of proving that no genuine issue of material fact exists as to whether Arkansas Code § 7–6–221 is unconstitutional.

### *Tax Credits* [25]

■ Under the Act, "a single credit against individual Arkansas income taxes shall be allowed for money contributions" to (1) a candidate or a candidate's campaign committee; (2) a small donor PAC; [26] (3) an

---

**24.** The statute required that an individual or organization that purchased advertisement time or space or circulated or published material in support of or opposition to a candidate must place a statement on the publication that identified who paid for the publication and whether it was published with the approval of the candidate. *Id.* at 1049–50.

**25.** This issue was not before the court in *Russell v. Burris.*

**26.** A small donor PAC is defined by the Act as any person who receives contributions in an amount of $25.00 or less, from one or more individuals, in order to make contributions to

approved PAC;[27] or an (4) organized political party.[28] Campaign Contribution Limits and Disclosure Act, sec. 10, § 7–6–222. The credit is limited to $50 a year for individuals and $100 a year on a joint return. *Id.*

Plaintiffs contend that Arkansas Code § 7–6–222 is unconstitutional because it "penalizes those persons who choose to associate with plaintiff ARL[ ], specifically Plaintiff Linane, and because it is a content-based infringement on First Amendment rights." *Memorandum in Support of Plaintiffs' Motion for Summary Judgment*, at 30–31. Plaintiffs assert that ARL is an "independent expenditure committee" and if plaintiff Linane chooses to contribute to ARL, she will be denied the benefit of the tax credit because a person who contributes to an "independent expenditure committee," does not receive the benefit of the credit under § 7–6–222. Plaintiffs assert that Linane will be penalized for her association with ARL.

First, nothing in the Act prohibits plaintiff Linane from contributing directly to a candidate or to any of the organizations listed in § 7–6–222 in addition to contributing to an "independent expenditure committee." In other words, in addition to contributing to an independent expenditure committee, she could also choose to contribute to a candidate, a small donor PAC, an approved PAC and/ or an organized political party, and receive the benefit of the $50 tax credit. Further, nothing in the Act prohibits an organization from qualifying as both a PAC and an independent expenditure committee.

In a recent Eighth Circuit opinion, the court discussed a similar statute. In *Rosen-*

*stiel v. Rodriguez*, 101 F.3d 1544 (8th Cir. 1996), cert. *denied*, —— U.S. ——, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997), the plaintiffs attacked a Minnesota statute that allows a taxpayer to claim a full refund of up to $50 per year for contributions to a publicly funded candidate. *Id.* at 1546. Minnesota's purpose in enacting the statute was to encourage its citizens to participate in its public financing program.[29]

The court stated that "even if we assume that the State's scheme does burden a candidate's First Amendment rights to some degree, the scheme generally, and the challenged provisions specifically, are still constitutionally permissible because they survive strict scrutiny; that is, they are narrowly drawn to serve a compelling state interest." *Id.*, at 1553 (footnote omitted). The court in *Rosenstiel* accepted as compelling the state's interest in preventing corruption that may arise from large campaign contributions, and the state's interest in decreasing the amount of time candidates have to spend in raising money, thereby increasing the time available for discussion of the issues. *Id.* "[G]iven the importance of these interests, the State has a compelling interest in stimulating candidate participation in its public financing scheme." *Id.*

The court also held that Minnesota's contribution refund statute was narrowly tailored to serve the state's compelling interest. *Id.*, at 1553.

The State reasonably could conclude that this additional form of public subsidy will encourage candidate participation because

---

candidates. Campaign Contribution Limits and Disclosure Act, sec. 1, § 7–6–201(12).

**27.** As stated earlier, an approved PAC is any person who receives contributions in an amount of $200.00 or less, from one or more individuals, in order to make contributions to candidates. Ark.Code Ann. § 7–6–201(9) (Michie 1993).

**28.** "Political party" is defined as:

any group of voters which, at the last-preceding general election, polled for its candidate for Governor in the state or nominees for presidential electors at least three percent (3%) of the entire vote cast for the office; or which files with the Secretary of State a petition signed by qualified electors equal in number to

at least three percent (3%) of the total vote cast for the Office of Governor or nominees for presidential electors at the last-preceding election, declaring their intention of organizing a political party, the name of which shall be stated in the declaration, and of participating in the next-succeeding general election. Ark.Code Ann. § 7–1–101(1)(A) (Michie Supp. 1995).

**29.** The State of Minnesota enacted a campaign financing system which permits candidates for certain elected state offices to receive a public subsidy in exchange for the candidate's agreement to adhere to specified limits on campaign expenditures. *Id.* at 1546. Once a candidate independently raises a certain amount of money, he or she is eligible for the public subsidy. *Id.*

candidates will believe that they will be able to draw campaign contributions from a broader array of the citizenry when citizens are informed that they may obtain a refund of up to $50 for contributions made to participating candidates.

*Id.*, at 1554.

As in *Rosenstiel*, Arkansas' interest in providing public financing for campaigns is a compelling state interest. Further, it is reasonable for Arkansas to conclude that the tax credit will encourage individuals who otherwise would not participate to contribute to candidates or to PACS.

Defendants contend that § 7–6–222 is not narrowly tailored because it does not allow persons who contribute to independent expenditure committees to receive the benefit of the $50 tax credit. The state's interest is in providing public financing to candidates in order to offset possible corruption that may occur from large contributions. That need would not be served by a statute that gave a credit to persons who contributed to independent expenditure committees. Independent expenditure committees, by their own definition, are organized to make independent expenditures—expenditures not authorized by candidates or their committees. In other words, the state's interest is in financing *campaigns, not independent expenditures.*

As the court in *Rosenstiel* stated, "[t]he state need not be completely neutral on the matter of public financing of elections." *Id.*, at 1555 (*quoting Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 39 (1st Cir.1993)). In *Rosenstiel*, the contribution refund only applied to candidates who agreed to participate in its public financing program. Thus, non-participating candidates did not receive any public subsidy. The court recognized that if the benefits of the public subsidy were conferred on participating and non-participating candidates alike, then there would be no incentive for candidates to participate in Minnesota's public financing program.

In this case, the state has no interest in assisting committees in raising funds for independent expenditures. Further, plaintiff Linane will not be penalized for associating with an independent expenditure committee, per se; she can still contribute to any other qualifying organization, in addition to an independent expenditure committee, and receive a tax credit up to $50 for her contributions.

Finally, plaintiffs reliance on the Supreme Court's decisions in *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), is misplaced. Those cases stand for the proposition that although a person has no right to a valuable government benefit, and the government may deny a person a benefit for any number of reasons, the government may not deny a benefit to a person on a basis that infringes his First Amendment rights to free speech or free association. *Perry*, 408 U.S. at 597, 92 S.Ct. at 2697.

In *Perry*, a college professor alleged that a university refused to renew his employment contract based on his public criticism of the policies of the college administration. *Id.*, 408 U.S. at 595, 92 S.Ct. at 2696. The Supreme Court held that it was constitutionally impermissible for the university to deny him the benefit of his employment contract based on the fact that he exercised his constitutional right to free speech. *Id.* 408 U.S. at 598, 92 S.Ct. at 2698.

However, nothing in Arkansas Code § 7–6–222 denies a person a benefit on a discriminatory basis. As the Court recognized in *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983):

We have held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny. *Buckley* ... upheld a statute that provides federal funds for candidates for public office who enter primary campaigns, but does not provide funds for candidates who do not run in party primaries. We rejected First Amendment and equal protection challenges to this provision without applying strict scrutiny. *Id.* 424 U.S. at 93–108, 96 S.Ct. at 670–677. *Harris v. McRae*, [448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)], and *Maher v. Roe*, 432 U.S. 464, [97 S.Ct. 2376, 53 L.Ed.2d 484] (1977), considered legislative decisions not to subsidize abortions, even

though other medical procedures were subsidized. We declined to apply strict scrutiny and rejected equal protection challenges to the statutes. The reasoning of these decisions is simple: "although government may not place obstacles in the path of a [persons's] exercise of .... freedom of [speech], it need not remove those not of its own creation." *Harris, supra,* 448 U.S., at 316, [100 S.Ct., at 2688].

*Id.* 461 U.S. at 549, 103 S.Ct. at 2003.

Therefore, we conclude that plaintiffs have not met their burden of demonstrating that Arkansas Code § 7–6–222 infringes on their First Amendment rights. We believe that genuine issues of material fact exist as to whether Arkansas Code § 7–6–222 is unconstitutional.

### 30 Day Black–Out Period [30]

 Arkansas Code § 7–6–203(g)(1) [31] states that "[i]t shall ·be unlawful for the Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General, Commissioner of State Lands, and members of the General Assembly to accept a contribution" 30 days before, during, and 30 days after any regular session of the General Assembly; during any extended session of the General Assembly; and during any special session of the General Assembly. Ark.Code Ann. § 7–6–203(g)(1) (Michie Supp.1995). We will refer to this statute as the "black-out periods."

Plaintiffs contend that the black-out periods unconstitutionally infringe on their First Amendment rights to free speech. Specifically, plaintiffs assert that Arkansas Code § 7–2–203(g) is not narrowly tailored to serve a compelling state interest.

 As we have stated many times in this opinion, the right to free speech, including the right to political speech, is a fundamental right protected by the First Amendment. Further, when a law burdens political speech, we must apply strict scrutiny, and uphold the restriction only if it is narrowly tailored to serve a compelling state interest.

The restriction at issue at this point, is not a monetary restriction or a disclosure requirement, but a restriction on the time when a contribution can be made to certain public officials. It is important to note at the outset that the black-out periods at issue in this case only apply to incumbents. In other words, non-incumbents are permitted to solicit and accept contributions during any regular session, extended session, or special session of the General Assembly.

An evaluation of a recent district court decision on this issue is beneficial in deciding plaintiffs' summary judgment motion. In *Shrink Missouri Government PAC v. Maupin,*[32] 922 F.Supp. 1413 (E.D.Mo.1996), the court found that a Missouri statute that imposed black-out periods on all candidates running for public office unconstitutionally violated the plaintiffs' First Amendment rights to free speech and association because the statute was not narrowly tailored to serve a compelling state interest. *Id.,* at 1425. We will refer to this case as "*Maupin 2.*"

In *Maupin 2,* the court found that the ban on accepting contributions during the regular session of the Missouri legislature constituted an infringement on political association and political communication because it prevented candidates from "amassing the resources necessary for effective advocacy." *Id.,* at 1420. We note that the plaintiffs in *Maupin 2* were campaign contributors and potential candidates, thus, they could assert the First Amendment rights of candidates. *Id.,* at 1415. In this case, we have already held that plaintiffs do not have standing to assert the rights of candidates. Nevertheless, plaintiffs may challenge the statute as a violation of their First Amendment rights.

Because the Missouri statute impinged on the plaintiffs' First Amendment rights, the court concluded that the statute must be narrowly tailored to serve a compelling state interest. The court accepted the state's interest in preventing corruption or the ap-

---

**30.** This issue was not before the court in *Russell v. Burris.*

**31.** This statute predated the Act.

**32.** Although this case involves the same parties, this is not the same case that was discussed earlier in regard to the disclosure requirement of § 7–6–221. Both cases involve lawsuits stemming from amendments to Missouri's Campaign Finance Disclosure Law.

pearance of corruption as a compelling state interest. Likewise, in this case, defendants have asserted that the state has a compelling interest in preventing any corruption, or the appearance thereof, that might occur from large campaign contributions being given during a session of the General Assembly in return for a quid pro quo by the candidate-member.

The court determined that the Missouri statute was not narrowly tailored. In reaching that conclusion the court found that the defendants had failed to "adduce any evidence of actual corruption taking place due to acceptance by incumbents or non-incumbents accepting contributions during the Legislature's regular session. The harm that the defendants seek to eradicate must exist and its 'cure' must specifically be directed toward elimination of that harm." *Id.,* at 1420.

As in *Maupin 2,* defendants have not produced any evidence that actual corruption has taken place due to incumbents accepting contributions during a session of the General Assembly. However, the procedural posture of *Maupin 2* is different than the procedural posture of this case. In *Maupin 2,* the court had considered the pleadings, the testimony of the witnesses, the affidavits, and the documents in evidence, and was asked to make findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. This case is currently before the court on plaintiffs' motion for summary judgment, and it is the plaintiffs' burden, as the moving party, to demonstrate to the court that no genuine issues of material fact exist as to whether the state has a compelling interest. We believe that plaintiffs have failed to meet their burden on this issue.

However, even if a compelling state interest exists, the restriction must be narrowly tailored to meet the state's need. The court in *Maupin 2* was troubled by the fact that the prohibition contained in the Missouri statute applied to "all officeseekers, incumbents and non-incumbents alike." *Id.,* at 1422. The court reasoned that:

[i]f its purpose is to curtail corruption or the appearance of corruption by eliminating financial quid *pro quo* contributions, the Court is hard-pressed to understand how this goal can be accomplished by applying the prohibition to non-incumbent candidates or even some public officials who are not subject to such a corrupting arrangement.

*Id.*

As defendants point out, Arkansas Code § 7–6–203(g) is more limited than the statute at issue in *Maupin 2.* Arkansas Code § 7–6–203(g) only applies to incumbents. Further, regardless of whether actual corruption exists, the appearance of corruption was recognized by *Buckley* as a legitimate state interest, and we believe that a genuine issue of material fact exists as to whether Arkansas Code § 7–6–203(g) is narrowly tailored to meet that state interest.

### Extension to Localities [33]

■ Under the Act, "[m]unicipalities, counties and townships shall have the authority to establish: reasonable limitations on the time periods candidates for local office shall be allowed to solicit contributions; limits on contributions to local candidates at amounts lower than those set by state law; and voluntary campaign expenditure limits" for local candidates. Campaign Contribution Limits and Disclosure Act, sec. 12, § 7–6–224.

Plaintiffs contend that the provision unconstitutionally infringes on their rights to speak. As the defendants point out, plaintiffs have not produced any evidence that any local jurisdiction in Arkansas has acted on this statute, and as the Honorable Wm. R. Wilson, Jr. stated, "[we] can 'only hypothesize that such an event will come to pass, and it is only on this basis that the constitutional claim could be adjudicated at this time.'" *Russell,* 978 F. Supp. at 1217 (*quoting Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 304, 99 S.Ct. 2301, 2312, 60 L.Ed.2d 895 (1979)).

Therefore, plaintiffs' motion for summary judgment on the issue of whether Arkansas

---

**33.** This issue was before the court in *Russell v. Burris.* The Honorable Wm. R. Wilson, Jr. dismissed the plaintiffs challenge to the constitutionality of Ark.Code § 7–6–224 because it was not ripe. *Russell v. Burris,* 978 F.Supp. 1211 (W.D.Ark.1997) (Memorandum & Order).

Code § 7–6–224 is unconstitutional is denied, as the issue is not ripe.

### Per Se Challenge

Finally, in the alternative, plaintiffs argue that the contribution limits contained in Title 7 of the Arkansas Code are unconstitutional on their face under Justice Thomas' concurrence in *Colorado Republican Federal Campaign Committee v. FEC,* 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996). Under Justice Thomas' view, the federal Act's contribution limitations fail the narrow tailoring test. *Id.,* —— U.S. at ——, 116 S.Ct. at 2329. It is Justice Thomas' opinion that "[b]road prophylactic bans on campaign expenditures and contributions are not designed with the precision required by the First Amendment because they sweep protected speech within their prohibitions." *Id.*

Plaintiffs assert that Arkansas' campaign contribution limits are unconstitutional on their face based on Justice Thomas' opinion. However, Justice Thomas' opinion is just that, Justice Thomas' opinion. The Supreme Court held in *Buckley* that contribution limits, even though they may impinge on First Amendment rights, may be constitutional if they are narrowly tailored to meet a compelling state interest. Therefore, we deny plaintiffs' motion for summary judgement on their claim that the contribution limits contained in Title 7 of the Arkansas Code are unconstitutional on their face.

### C. Plaintiffs' Motion to Amend its Verified Complaint

Plaintiffs filed a motion to amend their complaint on September 2, 1997. In their motion plaintiffs request leave to amend their complaint in order to substitute plaintiff Linane with David Sloan, an Arkansas citizen who contributes to political candidates and political committees, including ARL. Mr. Sloan states in his affidavit that he would like to make contributions in excess of the contribution limits imposed by the Act. Plaintiffs state that the reason for the substitution is that plaintiff Linane recently moved outside Arkansas.

Plaintiffs assert that the amended complaint would not add, subtract or alter in anyway any of the factual allegations or chal-lenges of their original complaint. Therefore, we grant plaintiffs' motion to amend.

### D. Defendants–Intervenors' Motion for a Continuance

Defendants-Intervenors filed a motion for a continuance pursuant to Federal Rules of Civil Procedure 56(f) on November 4, 1997. Rule 56(f) states:

[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or make such other order as is just.

Fed.R.Civ.P. 56.

Intervenors state in their brief the reason for their Rule 56(f) motion: "plaintiffs' motion for summary judgment includes several statements of material fact for which adequate response requires depositions and discovery. For example, their motion asserts it is the intent of Plaintiff ARL[ ] to accept contributions, to make contributions, and to make independent expenditures." *Intervenors' Memorandum of Law in Support of Rule 56(f) Motion,* at 4.

Thus, intervenors are requesting additional time so that they may engage in discovery to "identify the specific efforts Plaintiff ARL[ ] has taken to accept contributions, to make contributions, and to make independent expenditures." *Id.* We do not believe that discovery is needed to allow intervenors' to oppose plaintiffs' motion for summary judgment, thus, we deny intervenors' Rule 56(f) motion.

### IV. CONCLUSION

In response to plaintiffs' motion for summary judgment we:

(1) deny plaintiffs' motion for summary judgment on their claim that the Arkansas Code § 7–6–203(e), the $200 limit, is unconstitutional; (2) we deny plaintiffs' motion for summary judgment on their claim that the Arkansas Code § 7–6–203(k), the $500 limit, is

unconstitutional; (3) we grant plaintiffs' motion for summary judgment on their claim that Arkansas Code § 7–6–203(a), as it applies to the office of Governor, is unconstitutional; (4) we deny plaintiffs' motion for summary judgment on their claim that Arkansas Code § 7–6–203(a) and (b), the $100 limit and the $300 limit, except as it applies to the office of the Governor, is unconstitutional; (5) we deny plaintiffs' motion for summary judgment on their claim that Arkansas Code § 7–6–221, requiring self-identification, is unconstitutional; (6) we deny plaintiffs motion for summary judgment on their claim that Ark.Code § 7–6–222, permitting a tax credit for certain contributions, is unconstitutional; (7) we deny plaintiffs' motion for summary judgment on their claim that Ark.Code § 7–6–224, authorizing localities to set reasonable limitations, because the issue is not ripe; and (8) we deny plaintiffs' motion for summary judgment on their claim that the contribution limits contained in Title 7 of the Arkansas Code are unconstitutional on their face.

### ORDER

Now on this 18th day of November, 1997, upon consideration of plaintiffs' motion for summary judgment, plaintiffs' motion to amend their complaint, and plaintiffs' objection to inadmissible evidence, the court finds that:

Plaintiffs' motion for summary judgment should be and hereby is granted in part and denied in part, specifically, the court: (1) denies plaintiffs' motion for summary judgment on their claim that the Arkansas Code § 7–6–203(e), the $200 limit, is unconstitutional; (2) denies plaintiffs' motion for summary judgment on their claim that the Arkansas Code § 7–6–203(k), the $500 limit, is unconstitutional; (3) grants plaintiffs' motion for summary judgment on their claim that Arkansas Code § 7–6–203(a), as it applies to the office of Governor, is unconstitutional; (4) denies plaintiffs' motion for summary judgment on their claim that Arkansas Code § 7–6–203(a) and (b), the $100 limit and the $300 limit, except as it applies to the office of

the Governor, is unconstitutional; (5) denies plaintiffs' motion for summary judgment on their claim that Arkansas Code § 7–6–221, requiring self-identification, is unconstitutional; (6) denies plaintiffs motion for summary judgment on their claim that Ark.Code § 7–6–222, permitting a tax credit for certain contributions, is unconstitutional; (7) denies plaintiffs' motion for summary judgment on their claim that Ark.Code § 7–6–224, authorizing localities to set reasonable limitations, because the issue is not ripe; and (8) denies plaintiffs' motion for summary judgment on their claim that the contribution limits contained in Title 7 of the Arkansas Code are unconstitutional on their face.

Plaintiffs' motion to amend their verified complaint should be and hereby is granted.

Plaintiffs' objection to inadmissible evidence should be and hereby is sustained.

IT IS SO ORDERED.